## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SVETLANA DVORTSOVA,

          *Plaintiff,*

   v.

CITY OF PHILADELPHIA,

          *Defendants.*

CIVIL ACTION
NO. 21-548

**PAPPERT, J.**                                                                 February 9, 2022

## <u>MEMORANDUM</u>

Svetlana Dvortsova sued the City of Philadelphia under 18 U.S.C. § 1983.  She claims the City violated her rights under the Fourth and Fourteenth Amendments when it demolished a house she owns but does not live in without providing notice and an opportunity to be heard.  The City filed a motion for summary judgment that the Court, after reviewing the record evidence, the parties' filings and holding oral argument, denies.  Genuine disputes remain regarding the reasonableness of the City's decision to immediately demolish Dvortsova's property and the existence of a municipal custom of demolishing buildings without notice in the absence of exigent circumstances.

I

A

The Contractual Services Unit of Philadelphia's Department of Licenses and Inspections responds to complaints regarding "structurally unsound buildings" in the City.[1]  (Gallagher Dep. at 7:25–8:2, ECF 16-9); *see also* (*id.* at 20:3–5; Farley Dep. at

---

[1]     The Contractual Services Unit is also referred to as Emergency Services.  *See* (Gallagher Dep. at 13:25–14:1, ECF 16-9).

1

15:17–22, ECF 16-7).  Each inspector in the Unit is responsible for a particular area of the City, and all complaints about property in that area are assigned to that inspector the day after they are received.  (Farley Dep. at 16:6–24, 19:3–7; Gallagher Dep. at 11:18–23.)  Generally, the inspector visits the property within two or three days of receiving the complaint.  (Farley Dep. at 19:14–17, 23:8–11, 110:3–7; Gallagher Dep. at 16:4–14, 42:16–21.)  If a visual inspection reveals issues, the inspector may deem the property either "unsafe" or "imminently dangerous."  (Farley Dep. at 32:6–16, 42:5–9; Gallagher Dep. at 17:18–18:7.)  The Building and Occupancy Code defines imminently dangerous as an "imminent danger of failure or collapse of a structure or any part thereof which endangers life, or when any structure or part of a structure has fallen and life is endangered by the occupation of the structure."  Phila., Pa., Building Construction and Occupancy Code, § PM-110.1; *see also* (Farley Dep. at 43:21–24; Gallagher Dep. at 75:9–12.)  The Contractual Services Unit has identified a number of structural flaws that satisfy this definition.  *See* (Emergency Services & Abatement Unit Field Manual at 17–19, ECF 16-8; Farley Dep. at 43:21–24).

When inspectors determine a property is unsafe or imminently dangerous, they document the associated violations in eCLIPSE, the Department's electronic permitting and inspection system, and a notice of violation is sent to the property owner on record via regular and certified mail.  (Farley Dep. 45:23–46:21, 48:2–12; Gallagher Dep. at 66:6–7.)  A notice of demolition is also posted on the property itself.  (Farley Dep. at 120:21–121:3); Building Construction and Occupancy Code, § PM-110.3.

Normally, the owner of an imminently dangerous building is given ten days to remedy the violation.  (Manual at 4; Farley Dep. at 52:1–9; Gallagher Dep. at 75:21–

2

23.)  They also have five days to appeal the inspector's determination to the Board of Building Standards.  (Manual at 4); Building Construction and Occupancy Code, §§ A-801.2, A-802.1.  While the City usually refrains from acting on a property after an appeal is filed, the notice cautions that an appeal does not "stop any action by the City of Philadelphia."  (*Id.* at 5; Farley Dep. at 54:10–17, 133:3–7; Gallagher Dep. at 83:12–25.)  Instead, the property owner has to obtain a restraining order to stop the City.  (Gallagher Dep. at 83:12–20.)

If the code official believes "immediate action is required to protect the public safety," however, he is empowered to "cause the necessary work to be done to demolish the structure or to render the structure temporarily safe," regardless of whether notice has been provided.  Building Construction and Occupancy Code, § PM-110.4; *see also* (Gallagher Dep. at 106:15–18, 107:15–21, 127:2–12, 133:10–13; Clark Dep. at 28:4–6).  This decision is usually made by the Unit's demolition coordinators.  After an inspector deems a property imminently dangerous, the demolition coordinators decide "whether or when or if" the City will demolish the building.  (Farley Dep. at 41:10–16, 60:1–5.)  Most structures are put on a "pre-bid list" and slated for demolition after the ten-day period.  (Farley Dep. at 66:18–19, 84:16–18.)  But if the building presents a more immediate safety hazard—if it is considered an emergency—the City conducts a "curbside bid" so it can be demolished the next day.  (Farley Dep. at 66:20–24, 79:10–15; Clark Dep. at 22:7–10, 27:20–22.)  The demolition coordinators rely on the building inspector's recommendation when deciding whether a building should be demolished immediately.  (Gallagher Dep. at 97:12–13; Clark Dep. at 12:5–6.)

After the City announces a curbside bid, contractors come to the property at a designated time and bid for a contract to demolish the property. (Clark Dep. at 26:2–6.) The winner erects protective fencing within two hours of receiving the contract, and demolition begins within twenty-four hours. (Gallagher Dep. at 108:16–109:5; Farley Dep. at 80:10–14, 92:12–21; Clark Dep. at 33:13–24.) The Unit's Field Manual instructs staff to "check to ensure the owner received notice" before conducting a curbside bid. (Manual at 49; Gallagher Dep. at 133:5–6.) In reality, the City makes little effort beyond posting a sign on the property to notify the owner before an emergency demolition. (Gallagher Dep. at 127:2–12, 132:1–133:6; Farley Dep. at 123:15–23, 127:6–10; Clark Dep. at 38:24–39:4). As Demolition Coordinator Bartlett Clark explained, "If it's an immediate demolition, the owner cannot be notified prior to bidding out the job . . . . It's a matter of logistics. It's a matter of time." (Clark Dep. at 44:9–14.)

The Contractual Services Unit has used the curbside bide process for years. (Farley Dep. at 99:24–100:7; Clark Dep. at 48:14–49:4.) Unit Director Stephen Gallagher estimated the City conducts two or three curbside demolitions a month, though the number varies. (Gallagher Dep. at 107:22–108:10.)

### B

On September 9, 2020, someone called 311, which fields calls regarding non-emergency municipal services, to report one of the walls of 2544 Alter Street had collapsed. (311 History Report at 2, ECF 16-6); *see also* (Gallagher Dep. at 10:10–13). According to the City's records, the complaint was assigned to Inspector Michael Farley, a member of the Contractual Services Unit. (*Id*.) Director Gallagher testified

Farley should have visited the site within days of receiving the complaint, but Farley has no memory of receiving or responding to it.  (Gallagher Dep. at 42:2–25; Farley Dep. at 20:1–10, 23:18–22, 24:15–17.)

The following day, the owner of 1123 South 26th Street, which abuts the rear of 2544 Alter Street, called 311 to report the side wall of 2544 Alter Street had collapsed onto his property.  (311 History Report at 5.)  He was "fearful of the remaining structure collapsing and causing serious injury" because it was close to his back bedroom.  (*Id.*)  The complaint was assigned to a housing inspector, Valdemar Johnson, rather than to Michael Farley, perhaps because 311 misclassified it as a vacant property complaint.  (*Id.* at 7; Farley Dep. at 134:11–135:11; Gallagher Dep. at 30:19–31:17, 41:2–20.)  City records indicate Johnson did not review the complaint until October 19, 2020.  (311 History Report at 6.)

The case file summary maintained by the Department of Licenses and Inspections suggests Farley investigated the property on September 10, though Farley asserts he did not visit the site until several weeks later.  *Compare* (Case File Summary Report at 2, ECF 20-7) *with* (Farley Dep. at 13:5–7, 23:21–22).  Director Gallagher speculated this investigation may actually have been conducted by another investigator, perhaps Valdemar Johnson, and misattributed to Farley.  (Gallagher Dep. at 141:5–144:10.)  Whoever documented this visit made no mention of a collapsed wall. (Case File Summary Report at 2.)  They wrote only, "Section of permastone removed from front.  No one on site."  (*Id.*)  No violations were issued that day.  (*Id.*)

311 received another complaint about 2544 Alter Street on September 26.  (*Id.* at 8.)  The caller explained the side of the building had collapsed about a month ago.  (*Id.*)

He worried it was at "serious risk of collapsing and damaging various properties . . . and potentially anyone walking near it." (*Id.*)  This complaint was assigned to Michael Farley, who reviewed it on September 28, 2020. (*Id.* at 9–10.)

Farley visited 2544 Alter Street later that day. (Farley Dep. at 13:4–7.)  He confirmed the right wall had "collapsed onto the ground and onto the neighbor's yard on 26th street." (Farley Dep. at 25:1–4, 25:15–18.)  While an interior wooden wall remained standing, the double layer of bricks that supported the roof was gone. (*Id.* at 71:10–72:14.)  Without it, "the whole building could fall." (*Id.* at 72:20–22.)  There was no other visible damage to the building. (*Id.* at 32:2–7; Clark Dep. at 19:18–21.)  He determined the property was "imminently dangerous" and posted a notice on the door. (Farley Dep. at 42:7–24; Posted Notice, ECF 16-11.)  He also took photographs of the property. (Farley Dep. at 29:14 – 24); *see also* (Def. Ex. F , ECF 16-10).

The following day, the City mailed a notice of violation to Svetlana Dvortsova, the owner of 2544 Alter Street, at her address in Phoenixville, Pennsylvania. (Mailed Notice at 1, ECF 16-13; Dvortsova Dep. at 12:6–15, ECF 16-5.)  It explained the property had been deemed imminently dangerous and gave her until October 8 to make it safe. (*Id.*)  It also informed her she had until October 4 to appeal the "imminently dangerous" designation. (*Id.*)  An appeal would not, however, extend the time to comply with the notice or "stop any action by the City of Philadelphia." (*Id.* at 5.)

The notice was destined to be futile. At some point on September 28, Farley provided Coordinator Clark with photos of the property and recommended it be demolished. (Farley Dep. at 63:23–64:8; Clark Dep. at 8:7–10, 10:7–10.)  Based on the photographs, Farley's recommendation and his "description of what had happened,"

Clark decided it needed to be demolished immediately.  (Clark Dep. at 9:18–20, 13:15–18, 16:13–18; Farley Dep. 61:5–18, 76:24–15.)  Both Farley and Clark believed the risk the rest of the building would collapse created an emergency situation.  (Farley Dep. at 81:18–82:15; Clark Dep. at 22:21–24.)  Without the side wall, the roof could collapse and "push out the front wall, which [was] on a very small sidewalk where any passerby and cars parked there would be damaged; people would be injured or killed."  (Clark Dep. at 18:17–22.)  Clark consulted his supervisor Richard Quigley, who told him to "go ahead and do what you think you need to do."  (*Id.* at 12:1–2.)

Clark scheduled a curbside bid for noon on September 29.  (Notice of Curbside Bid, ECF 16-15; Clark Dep. at 9:14–20.)  When he arrived at the property to conduct the bid, his examination of the property confirmed his belief that immediate demolition was appropriate.  (Clark Dep at 27:9–16.)  He went forward with the curbside bid and demolition began shortly thereafter.  (Clark Dep. at 20:3–14; Farley Dep. at 118:3–5); *see also* (Pl.'s Statement of Uncontested Facts ¶ 81, ECF 20-18).  Clark and Farley knew when the demolition occurred that Dvortsova had no notice of the City's plans.  (Clark Dep. at 15:24–16:12, 26:19–21, 43:18–20; Gallagher Dep. at 102:2–11.)  Director Gallagher was not involved in the decision to demolish 2544 Alter Street.  (Gallagher Dep. at 28:1–8, 99:21–23.)

At the time, Clark was under the impression the wall had collapsed the previous day.  (Clark Dep. at 7:20–8:1.)  When asked why the City had allowed the building to remain standing after the first complaints concerning the collapse, he responded, "It wasn't allowed to stay in that condition because it wasn't in that condition. . . . It collapsed that day, the 28th of September; that's why we acted on it."  (Clark Dep. at

20:9–14.)  He claims he received that information from Inspector Farley.  (*Id.* at 20:19–24.)

Clark also testified that if the owner were on-site, it might have been possible to delay the curbside bid process to allow the owner to obtain a recommendation from a structural engineer and complete the necessary repairs.  (Clark Dep. at 49:3–4); *see also* (*id.* at 46:5–48:4.)  But because there was no way to notify the owner in time, there was no way for the owner to avert the need for an immediate demolition.  (*Id.* at 48:4–6.)

C

Dvortsova received the notice of violation by regular mail on Friday, October 2, and by certified mail on Saturday, October 3.  (Dvortsova Dep. at 10:11–14.)  She had not visited the property since the end of August, and this was the first she learned of the collapse.  (*Id.* at 33:12–24.)  She drove to the property on October 3 with her husband and a contractor.  (*Id.* at 33:10–12.)  They discovered the second floor had already been demolished.  (*Id.* at 34:10–13.)  Dvortsova did not appeal the notice or attempt to obtain the permits required to repair the property.  (*Id.* at 56:13–17, 78:16–18.)

On Monday, October 5, after the deadline to appeal had passed, she called Inspector Farley in an attempt to stop the demolition.  (*Id.* 58:17–20.)  According to Dvortsova, Farley seemed unaware demolition had already begun.  (*Id.* at 59:10–14.)  Farley apparently promised to call her back, but did not do so.  (*Id.* at 59:15–17.)  Dvortsova reached Farley again the next day.  (*Id.* at 59:18–19.)  At this point, he said he had no power to stop the demolition.  (*Id.* at 59:19–21.)  Farley does not remember these conversations.  (Farley Dep. at 102:7–20.)

8

Dvortsova also contacted the Department of Licenses and Inspections that Monday.  (*Id.* at 56:24–57:5.)  They told her she could pursue "some kind of emergency hearing," but that the process would take three or four days.  (*Id.* at 60:9–12.)  She did not seek a temporary restraining order to halt the demolition or have any further communications with L & I.  (*Id.* at 60:19–22, 63:1–21.)

This was not Dvortsova's first experience with L & I.  She owns ten properties in the Philadelphia.  (*Id.* at 13:15.)  The City has found violations at many of them.  *See* (*id.* at 84:18–89:16).  Indeed, 2544 Alter Street was deemed unsafe in 2008 and again in 2010.  (*Id.* at 65:16–20, 67:5–23.)  Normally, the City sent Dvortsova a notice and she corrected the violation.  (*Id.* at 85:20–22.)  But she asserts the City improperly demolished two of her properties in the past.  (*Id.* at 71:7–10, 73:16–24.)  Once, they did so without providing any notice of the alleged violation.  (*Id.* at 72:21–24.)  She claims they demolished another property despite the fact she had already fixed the violations identified by the City.  (*Id.* at 72:13–16.)

## II

Summary judgment is proper if the movant proves "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A fact is material if it may affect the outcome of the suit "under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  A mere scintilla of evidence supporting the nonmoving party, however, will not suffice.  *Id.* at 252.  Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 256.  These facts

must allow it to "make a sufficient showing on essential elements" of its case that it bears the burden of proof on.  *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015).

At summary judgment, a court may consider any material in the record that may be admissible at trial.  *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Memorial Hosp.*, 192 F.3d 378, 387-88 & n.13 (3d Cir. 1999).  In doing so, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions."  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).  Nor may a court make credibility determinations or weigh the evidence.  *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

III

A

Before a person's property may be taken, the state must ordinarily provide notice and an opportunity to be heard.  *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795 (1983).  While the Due Process Clause of the Fourteenth Amendment does not mandate the property owner receive actual notice, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection."  *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).  Additionally, if the government knows its normal procedure for giving notice will be ineffective, it must take reasonable additional steps to provide it .  *Id.* at 229–

10

234.  When pre-deprivation notice is required, even "the most thorough and fair" post-deprivation procedures will not excuse its absence.  *Alvin v. Suzuki*, 227 F.3d 107, 120 (3d Cir. 2000).

But pre-deprivation notice is not always required.  In emergency situations, where quick action is necessary and pre-deprivation process impractical, the state satisfies due process by providing "some meaningful means by which to assess the propriety of the [s]tate's action at some time after the initial taking."  *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)).

The Constitution affords government officials some leeway in deciding whether exigent circumstances make pre-deprivation process unfeasible.  *Id.* at 418.  As long as "competent evidence" could lead an official to reasonably believe an emergency exists, only an arbitrary decision to forgo pre-deprivation process would violate due process.  *Id.* (quoting *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999)).

B

The record makes clear that if pre-deprivation notice was required, the City did not provide it.  The City issued the notice of violation the same day it authorized the property's demolition.  *Compare* (Violation Notice) *with* (Notice of Curbside Bid).  Clark acknowledged there was "no way" Dvortsova could have received it before the demolition.  (Clark Dep. at 16:1–2); *see also id.* at (46:5–7).

Nor could posting alone satisfy the requirements of due process.  There was no reason to believe Dvortsova would see the posted notice.  The property was unoccupied and in disrepair.  (Farley Dep. at 25:1–4, 32:23–33:3, 80:24–81:1; Clark Dep. at 39:13–

11

17).  Neither Farley nor Clark saw or spoke with Dvortsova at the property.  (Farley

Dep. at 101:12–18; Clark Dep. at 39:13–17.)  Under these circumstances, no one

"desirous of actually informing" the owner would have relied solely on posted notice.

*Mullane*, 339 U.S. at 315.

Indeed, our Court has previously found the City's posted notice ineffective when

it was clear no one lived at the property.  *Gordon v. City of Philadelphia*, No. CIV A 07-

5039, 2009 WL 2710247, at *4 (E.D. Pa. Aug. 28, 2009).  Similarly, in *Greene v. Lindsey*,

456 U.S. 444 (1982), the Supreme Court held that "merely posting notice on an

apartment door" did not satisfy due process where there was evidence it would fail to

provide actual notice "in a significant number of instances."  *Id.* at 453.  So too here.

C

The real question is whether such notice was required.  At first glance, the City

makes a strong case that Dvortsova's property was a safety hazard that warranted an

immediate response.  Farley and Clark believed after the collapse of the side wall, what

was left of the building had "no structural stability."  (Farley Dep. at 72:11; Clark Dep.

at 18:17–19.)  If the building collapsed, it could injure trespassers and passersby.

(Farley Dep. at 66:20–23, 81:18–82:15; Clark Dep. at 18;18–22.)  Pictures of the site

corroborate their assessment. (Def. Ex. F); *see also* (Farley Dep. at 68:17–72:7

(explaining the studs visible on the exposed second floor were not "designed to hold the

load of the roof")).

A reasonable jury could conclude, however, that Clark's decision to immediately

demolish the property was based not on competent evidence, but bad information.

Specifically, Clark's conversation with Farley left him under the impression the side

12

wall had collapsed on September 28, the day before the curbside bid.  (*Id.* at 7:20–8:1, 20:9–24).

Other evidence in the record suggests the wall collapsed much earlier.  The 311 calls from September 9 and 10 both mentioned a collapsed wall.  (311 History Report 2, 5.)  The September 10 caller specifically said a "side wall" had collapsed.  (*Id.* at 5.)  In addition, the 311 caller whose complaint ultimately triggered the property's demolition said the wall had collapsed  "about a month ago."  (*Id.* at 8.)

The eCLIPSE notes from the September 10 inspection of 2544 Alter Street suggest Farley may have had personal knowledge of the condition of the property before September 28.  (Case File Summary Report at 2.)  But even if he did not, the September 26 complaint he reviewed put him on notice that the wall may have collapsed as early as late August.  At the very least, it made it implausible that the wall collapsed on the 28th, two days *after* the third 311 call.  Given this evidence, a jury could determine Clark was wrong about when the building collapsed, and that he was wrong because Farley provided him inaccurate information.

There is also evidence that the date on which the wall collapsed impacted Clark's assessment of the urgency of the situation.  At his deposition, Clark said the fact that the wall had collapsed the day before was "why [the City] acted on it" when it did. (Clark Dep at 20:11–12.)  This mistake calls into question his conclusion that there was no time to notify the owner so she could attempt to eliminate the hazard.  *See Philly Auto, Inc. v. City of Philadelphia*, 362 F. Supp. 3d 272, 279 (E.D. Pa. 2019); *Bullard v. City of Philadelphia*, 847 F. Supp. 2d 711, 720 (E.D. Pa. 2012).

As a result, a genuine issue of fact remains regarding whether Clark's decision to invoke emergency procedures was reasonable.  If a miscommunication between City officials, rather than the facts available to them, created the appearance of an emergency, Clark's decision to forego notice would be arbitrary.

IV

The contours of Dvortsova's second claim against the City are obscured by her conflation of the Fourth Amendment's protection against unreasonable seizures with the concept of substantive due process.  For example, she titles Count II of her complaint "substantive due process," but then alleges the City violated her Fourth Amendment rights.  (Compl.  ¶¶ 74–77, ECF 1.)  Similarly, in her Response to the City's Motion for Summary Judgment, she contends she "established a claim under Fourth Amendment substantive due process."  (Pl.'s Resp. Opp'n at 16, ECF 20-1 (additional capitalization removed).)  But the two are not interchangeable.  *See Gottlieb ex rel. Calabria v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 171 (3d Cir. 2001).

Here, the Fourth Amendment controls.  When the Government seizes property within the meaning of the Fourth Amendment, it, "not the more generalized notion of 'substantive due process,'" supplies the standard for assessing the constitutionality of the government's conduct.  *Win & Son, Inc. v. City of Philadelphia*, 162 F. Supp. 3d 449, 462 (E.D. Pa. 2016) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).  Because "destroying property meaningfully interferes with an individual's possessory interest in that property,"  the demolition of 2544 was a Fourth Amendment seizure.  *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209 (3d Cir. 2001); *see also Philly Auto*, 362 F. Supp. 3d 272, 279.

14

To prove the demolition of her property violated the Fourth Amendment, Dvortsova must show the seizure was unreasonable. *See Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 71 (1992) ("'[R]easonableness is still the ultimate standard' under the Fourth Amendment.") (quoting *Camara v. Mun. Ct. of City & Cty. of San Francisco*, 387 U.S. 523, 539 (1967)). Evaluating reasonableness requires a "careful balancing of governmental and private interests." *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)); *see also Brown*, 269 F.3d at 210.

Dvortsova's Fourth Amendment claim survives summary judgment for the same reasons her procedural due process claim does. If Clark's decision to immediately demolish her property was justified and post-deprivation process was available, the City's seizure of 2544 Alter Street was reasonable. *See Gardner v. McGroarty*, 68 F. App'x 307, 312 (3d Cir. 2003); *Win & Son,* 162 F. Supp. 3d at 464. Conversely, if Clark's belief an emergency existed was unreasonable, his decision to demolish the building without affording Dvortsova an opportunity to repair her property or challenge the demolition would violate the Fourth Amendment. *See Philly Auto*, 362 F. Supp. 3d at 279; *Deiter v. City of Wilkes-Barre*, No. 16-132, 2021 WL 2020589, at *14 (M.D. Pa. May 19, 2021). Because the record leaves room to doubt the reasonableness of Clark's belief, the Court cannot resolve Dvortsova's Fourth Amendment claim in the City's favor.

V

Dvortsova argues her injuries were caused by an unconstitutional policy or custom of ordering curbside demolitions without providing notice to the owner. (Oral Arg. Tr. at 103:24–25, ECF 27) *see also* (Pl.'s Resp. Opp'n at 23, ECF 20-1; Compl. ¶ 59,

ECF 1). While she produced no evidence of an unconstitutional City policy, a jury could conclude a municipal custom permitted City employees to order immediate, non-emergency demolitions in violation of due process.

A

Section 1983 imposes liability on local governments for injuries caused by an unconstitutional municipal policy or custom. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). A policy is "an official proclamation, policy, or edict" issued by someone with final authority to set municipal policy on that subject. *Id.* at 106. A custom, by contrast, is "a given course of conduct . . . so well-settled and permanent as virtually to constitute law." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). A plaintiff can establish the existence of a custom by demonstrating the relevant policymaker knew of and acquiesced to an unconstitutional practice. *Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007).

An official is considered a municipal policymaker if, as a matter of state law, he has final and unreviewable authority to set policy on the subject at issue. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264 (3d Cir. 2010). A subordinate's decisions can only establish policy "if a municipal policymaker delegated power to the employee or ratified his decision." *Id.* But a lower-ranking official does not have delegated policymaking authority simply because he exercises some discretion. *Id.*; *see also Parker v. Sch. Dist. of Philadelphia*, 346 F. Supp. 3d 738, 748 n.4 (E.D. Pa. 2018) ("[T]here is a distinction between a delegation of policymaking authority and a simple delegation of discretionary decision making."). Similarly, a final policymaker only

16

ratifies a subordinate's decision if they approve the decision "and the basis for it."

*LaVerdure v. Cty. of Montgomery*, 324 F.3d 123, 125–26 (3d Cir. 2003) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)).

B

Dvortsova makes two arguments in an attempt to establish the existence of a municipal policy of demolishing properties without due process.  First, she points to evidence the Contractual Services Unit has a history of conducting curbside bids without checking to see that the owner received notice, "in direct contravention" of the City's written policies and procedures.  (Pl.'s Resp. at 23).  Second, she argues Bartlett Clark was a final decisionmaker who established a policy of demolishing properties without verifying the owner received notice.  (*Id.* at 23 – 24.)

Both arguments miss the mark.  To begin, an employees' failure to follow City policy cannot establish municipal liability.  *See Win & Son*, 162 F. Supp. 3d at 462.  If municipal policy says one thing and an employee does another, municipal policy does not cause whatever consequences flow from the employee's unauthorized conduct.  So if the City's Building and Occupancy Code or the Unit's Field Manual require notice under these circumstances, Clark's failure to provide it is not attributable to the City. *See Kranson v. Valley Crest Nursing Home*, 755 F.2d 46, 51 (3d Cir. 1985) ("The carelessness of an employee in failing to follow a policy . . . does not fasten liability on the governmental agency.").  Instead, Dvortsova has to point to an official proclamation, policy, or edict that permits demolition without constitutionally required notice.

But the only City policy that authorizes demolition without notice is constitutional.  The Building and Occupancy Code requires notice be provided to owners

17

of imminently dangerous structures unless "in the opinion of the code official, immediate action is required to protect the public safety." § PM-110.4; *see also* § PM-110.2.  In explaining the curbside bid process, both Clark and Gallagher pointed to the Department's "emergency powers" under the Code.  (Clark Dep. at 28:4–5; Gallagher Dep. at 133:10–13).  As long as the official's belief is reasonable and based on competent evidence, the decision to invoke this provision does not violate due process. *Elsmere*, 542 F.3d at 417.  Even if Clark was wrong about whether an emergency existed in this case, the policy that authorized the demolition is not unconstitutional.

Nor can Dvortsova argue that in ordering the demolition of 2544 Alter Street, Clark established a new policy of demolishing properties without notice in non-emergency situations.  Clark is not a final policymaker for the City.  While Clark was empowered to order a demolition without consulting his supervisors, (Gallagher Dep. at 98:11–13), his authority was not final and unreviewable.  Both Director Gallagher and Clark's immediate supervisor could review and override Clark's determinations.  (Clark Dep. at 9:23–10:1.)  In fact, it was "customary" for Clark to consult his supervisor before ordering a curbside bid, and he did so here.  (*Id*. at 11:17–19; 12:5–6.)  Ultimately, it was Gallagher who could have the "final say" if he chose to be involved.  (Farley Dep. at 63:11–13); *see also* (Clark Dep. at 36:1–3).

"Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Praprotnik*, 485 U.S. at 130; *see also Porter v. City of Philadelphia*, 975 F.3d 374, 385 (3d Cir. 2020).  But that is exactly what happened here.  Clark consulted his supervisor, himself not a final policymaker, who told him to "go ahead and do what you think you need to do."  (Clark

Dep. at 12:1–2.)  It is hard to imagine a more clear-cut case of "simply going along" with a subordinate's discretionary decision.  More importantly, while Director Gallagher retained the authority to decide whether a demolition should take place, he was not involved in the decision to demolish 2544 Alter Street.  (Gallagher Dep. at 98:19–25.) No reasonable jury could conclude Clark exercised policymaking authority or that his decision had been ratified by a final decisionmaker.

C

While there is no evidence the City had a policy of employing the curbside bid process to demolish properties without notice in the absence of an emergency, there is evidence of a custom of doing so.  Dvortsova argues the demolition of her property was the continuation of the unconstitutional custom—first identified in *Gordon v. City of Philadelphia* and *Bullard v. City of Philadelphia*—of employing the curbside bid process to demolish properties in situations where due process required notice and an opportunity to be heard.  *See* (Pl.'s Resp. at 24, 26–27).  A reasonable jury could conceivably agree with her.

In *Gordon*, Judge Tucker found the City violated the plaintiff's due process rights when in August 2007, the head of the Contractual Services Unit ordered a curbside bid and demolition of the plaintiff's property on the same day it was declared "dangerous."  2009 WL 2710247, at *3–4.  The City demolished the plaintiff's property without notice despite letting her application to repair the property, which had previously been deemed "unsafe," languish for months.  *Id.* at *2–3.  Judge Tucker implicitly rejected the contention an emergency justified the abrupt decision to conduct a curbside bid demolition.  *See id.* at *3 (noting the "significant disconnect" within the

Department of Licenses and Inspections that allowed one division to issue a permit to repair a property after sitting on it for several months, only to discover the property had been demolished by another division two weeks earlier).  She also found the demolition was part of an unconstitutional custom of demolishing buildings via the curbside bid process without providing adequate notice.  *Id.* at 5.

The City ran afoul of the Constitution again in August 2010 when it employed the curbside bid process to demolish a property even though no emergency existed.  *Bullard*, 847 F. Supp. 2d at 716, 720.  Judge Rufe found there was no competent evidence to support the conclusion immediate demolition was necessary and that the demolition was a continuation of the unconstitutional custom identified in *Gordon*.  *Id.* at 720, 722.

The findings are consistent with Dvortsova's own testimony.   She claims that in 2014, the City demolished two of her properties without providing notice.  (Dvortsova Dep. at 71:9–73:24.)  In one case, the demolition occurred after she had already completed the repairs necessary to eliminate the supposedly dangerous conditions.  (*Id.* at 73:19–24.)  If the jury credits her version of events, the fact that a single individual was subjected to three constitutionally deficient demolitions in less than ten years would go a long way to proving these violations were widespread.

Additionally, there is evidence beyond Dvortsova's own case from which a jury could conclude that this municipal custom continued until the City demolished 2544 Alter Street in September 2020.  In May 2017, Director Gallagher ordered the curbside bid demolition of a warehouse that had been damaged in a fire.  *Philly Auto, Inc. v. City*

*of Philadelphia*, 362 F. Supp. 3d 272, 276 (E.D. Pa. 2019).[2]  The bid occurred the

following day and demolition began the day after.  *Id.*  In that case, a factual question

remained regarding whether Gallagher ordered the demolition because he reasonably

believed an emergency existed, or simply because the owners had not contacted him.

*Id.* at 279.

If Dvortsova can show in this trial that Gallagher's decision to demolish the

warehouse without notice was unreasonable or not based on competent evidence an

emergency existed, it could suggest the custom identified in *Gordon* and *Bullard*

continued under his leadership and that he acquiesced to it—indeed, he participated in

it.

Unlike Clark, Director Gallagher may indeed be the City's final policymaker

regarding the demolition of dangerous buildings.  Inspector Farley testified that

Gallagher "[could] have the final say" in whether a building would be immediately

demolished, (Farley Dep. at 63:11–13), and Clark mentioned only two people who could

"override" his initial decision to demolish a building: his supervisor and Director

Gallagher, (Clark Dep. at 9:23– 10:1).  There is no evidence Gallagher's demolition

decisions were reviewed by his superiors at L & I.  Even if Gallagher was not the

ultimate repository of policymaking authority under state law, a reasonable juror could

conclude that authority had been delegated to him.  *See also Bullard*, 847 F. Supp. 2d

---

[2]       *See also* Dep. Stephen Gallagher at 63:22–64:5, *Philly Auto, Inc. v. City of Philadelphia*, 362
F. Supp. 373 (2019) (No. 18-669), ECF 28-5.  In resolving a motion for summary judgment, the Court
"may take judicial notice of affidavits, properly proved agreements, depositions, sworn testimony,
and similar material of public record in a court's own public records" even if they are not "formally
filed in a case at bar." *United States v. Webber*, 396 F.2d 381, 387 (3d Cir. 1968); *see also* 10A
Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2723 (4th ed.)
(explaining that courts "may take notice of other cases involving the same subject matter").

at 722 (concluding that Gallagher's predecessor in the Unit was the final policymaker on this issue).

When combined with Dvortsova's own experiences with the City, the findings in *Gordon* and *Bullard* and the record in *Philly Auto* permit a reasonable juror to conclude there was a municipal custom of conducting curbside bids without notice even when it was unreasonable to believe an emergency demolition was necessary.  Dvortsova can point to instances in 2007, 2010, 2014 and 2017 that arguably illustrate an unconstitutional practice by employees in the Contractual Services Unit.  In at least three of these cases, the head of the Unit ordered the curbside bid, which suggests the City knew of and acquiesced to the custom, even if it never became official policy.  *See Philly Auto*, 362 F. Supp. 3d at 276; *Bullard*, 847 F. Supp. 2d at 722; *Gordon*, 2009 WL 2710247, at \*3.  The last of these allegedly improper prior demolitions occurred just three years before the City demolished 2544 Alter Street.  Given the relative infrequency of curbside demolitions and the length of time over which the custom may have existed, this is enough to survive summary judgment.[3]

C

Obviously, Dvortsova must prove the existence of this unconstitutional custom at trial.  *Cf. Porter v. City of Philadelphia*, 975 F.3d 374, 384 (3d Cir. 2020) (explaining that when a genuine dispute exists, "the existence, nature, and reasonableness" of a municipal policy or custom is best left to the jury).  While the facts and findings in

---

[3]     The City argues Dvortsova failed to demonstrate deliberate indifference on the part of a municipal policymaker.  (Def.'s Mem Supp. Summary Judgment at 17–18, ECF 16-2.)  But Dvortsova's case against the City is premised on the existence of an unconstitutional policy or custom, not a failure or inadequacy on the part of the City.  (Compl. ¶¶ 19, 59; Pl.'s Resp. at 22–24.)  Accordingly, proof of deliberate indifference is not required.  *Forrest*, 930 F.3d at 105–06; *see also Est. of Roman*, 914 F.3d at 798.

*Gordon*, *Bullard*, and *Philly Auto* demonstrate a triable issue of fact exists regarding whether the City had a custom of ordering the immediate demolition of properties in non-emergency situations, simply gesturing to these cases will not be enough carry Dvortsova's burden at trial.  Even if the City is estopped from relitigating the existence of an unconstitutional custom in 2010, Dvortsova must introduce evidence to convince the jury it persisted over the next decade and caused her injury.

Moreover, Philadelphia's curbside bid process is not inherently unconstitutional. When City officials reasonably conclude the property represents an immediate danger, demolition without notice is appropriate.  *Elsmere*, 542 F.3d 418.  As a consequence, the City cannot be held liable for simply for having a "custom of making the decision to demolish, and then, within hours, soliciting bids from contractors and demolishing the building." *Bullard*, 847 F. Supp. 2d at 722.   Instead, there must be evidence the City had a custom of using that procedure in circumstances where doing so "does not comport with due process." *Id.*

In *Porter v. City of Philadelphia*, 975 F.3d  374, the Third Circuit Court of Appeals explained a city cannot be liable for the unconstitutional application of a facially constitutional policy in the absence of evidence the city had a custom of applying the policy in an unconstitutional manner.  *Id.* at 391–92.  The same reasoning applies to Dvortsova's challenge to the City's curbside bid process.  To hold the City liable, she must prove Philadelphia had a custom of ordering the immediate demolition of properties without competent evidence an emergency existed.

An appropriate Order follows.

23

BY THE COURT:

**_/s/ Gerald J. Pappert_**

GERALD J. PAPPERT, J.